## AUSTIN BRIDGE CO. et al. v. TEAGUE.

### No. 9007.

Court of Civil Appeals of Texas. Austin.
March 5, 1941.

Rehearing Denied April 9, 1941.

Coleman Gay, of Austin, (Turner, Rodgers & Winn and M. B. Solomon, all of Dallas, of counsel), for appellant.

A. M. Felts, Wheeler & Wheeler, and F. A. Tyler, all of Austin, for appellees.

BLAIR, Justice.

Appellee, B. C. Teague, sued appellants, Austin Bridge Company, Austin Road Company, and the Superior Lloyds of America, as surety, for the difference in the wages paid him as an unskilled laborer and the wages claimed to be due him as a skilled laborer for work done on a public works contract; and on a trial to the court without a jury recovered judgment for $479.40 as the balance of wages due, less 1% for payment of old age benefits; $47.-94 as attorney's fees; and 6% interest on the judgment from its date; hence this appeal.

Appellee sued as a third party beneficiary under a contract between Austin Bridge Company-Austin Road Company and the State Highway Commission for the difference between the amount paid him as an unskilled laborer and the amount claimed to be due him for labor performed as a skilled laborer or master finisher of cement in the construction of bridges and culverts for the State of Texas on its Federal Aid Project #74 (2) in Travis County; appellee pleading as the basis of his right of recovery the. contract and the provisions of Article 5159a, Vernon's Ann. Civ.Statutes (Acts 1933, 43rd Leg. p. 91), which statute was expressly made a part of the contract. Appellants contend that this statute does not afford appellee the remedy sought by him, and that he was not a third party beneficiary under the contract. Neither contention is sustained.

The emergency clause of the Act of 1933 recites that its purpose is to protect "laborers, workmen and mechanics engaged in doing and performing work on public works" and to secure to them the payment of certain per diem wages. The portions of the Act applicable here provide in substance as follows:

1. That before undertaking any public work the State Highway Commission "shall ascertain the general prevailing rate of per diem wages in the locality in which the work is to be performed for each craft or type of workman or mechanic needed to execute the contract"; and shall fix the rate of per diem wages to be paid them in the execution of the contract at "not less than the general prevailing rate of per diem wages for work of a similar character in the locality in which the work is performed"; and "shall specify in the call for bids for said contract, and in the contract itself," the rate of per diem wages so ascertained and . fixed.

2. That the prevailing rate of per diem wages so determined by the Commission "shall be final."

3. That "it shall be mandatory upon the contractor * * * and * * * subcontractor * * * to pay not less than the said specified rates."

4. That "the contractor shall forfeit as a penalty to the State * * * Ten Dollars ($10.00) for each laborer, workman or mechanic employed, for each calendar day, or portion thereof, such laborer, workman or mechanic is paid less than the said stip-

ulated rates for any work done under said contract," and the Commission shall "cause to be inserted in the contract a stipulation to this effect."

5. That "it shall be the duty of such public body [Commission] awarding the contract, and its agents and officers, to take cognizance of complaints of all violations of the provisions of this Act committed in the course of the execution of the contract, and, when making payments to the contractor of monies becoming due under said contract, to withhold and retain therefrom all sums and amounts which shall have been forfeited pursuant to the herein said stipulation and the terms of this Act."

Section 5 of said Act of 1933 is Art. 1581a of Vernon's Ann. Penal Code and provides that a fine of not exceeding $500 or six months' imprisonment, or both, may be imposed upon any contractor or any representative of the state or political subdivision thereof, who shall wilfully violate or omit to comply with any of the provisions of the Act.

The contract referred to and made the Act of 1933 a part of it, and as directed by the Act, the Commission inserted the penalty clause in the contract, and specified in its call for bids and caused to be inserted in the contract its order ascertaining and fixing the general prevailing rate of per diem wages on an eight hour per day basis at $1 per hour for skilled labor; fifty cents per hour for intermediate labor; and forty cents per hour for unskilled labor. This order also defined in general terms the three stated classifications of labor, listing various kinds of laborers, workmen and mechanics under each classification; and listed under the classification "Skilled Labor," among others, is "Master Finisher (pavement and structure)."

■ Appellants concede that the Act is primarily for the protection and benefit of the laborers and workmen in securing to them payment of the minimum wages prescribed. They contend, however, that since the Act does not specifically authorize workmen to bring suit for such wages claimed to be due them for work performed in the execution of a public works contract, they have no such right. In this connection, appellants cite the provisions of the Act giving the Commission the right to require the contractor to keep accurate records of work done by each laborer and the amount paid him; its right and duty to investigate all complaints for violation of the Act; and its right to forfeit to the state $10 per day for each laborer for each day he is paid less than the minimum rate of wages prescribed; as being summary remedies provided by the statute in behalf of the workmen, and as being the exclusive remedies afforded by the statute. In addition, the penal code imposing a fine of $500 or six months' imprisonment, or both, upon any contractor or any representative of the state or any subdivision thereof, for violation of the statute, is also cited as a further summary remedy in behalf of the workmen.

It is true that these remedies or provisions for the enforcement of the statute may indirectly aid workmen in securing the payment of the minimum rate of wages; but we do not regard them as being exclusive. Such provisions are penal in nature and like all penal laws were intended as deterrents to contractors not to pay less than the minimum rate of wages. Their enforcement, however, does not actually pay the minimum rate of wages prescribed, which is the primary objective of the statute, and we can conceive of no good reason why the legislature would give workmen the right to require a contractor of public works to pay them a minimum rate of wages, and then deny them the right to sue the contractor for such wages. We think the Act contemplates the authority of workmen to enforce their right to be paid such wages by suit against the contractor. This becomes apparent when the Act in question is considered with other statutes enacted for the benefit and protection of workmen or laborers furnishing labor to any contractor for any public works. That is, Chap. 17, Acts 1925, 39th Leg., p. 44, Vernon's Ann.Civ.St. Arts. 5472a, 5472b, provides that a workman or laborer furnishing labor to any contractor for any public improvements shall have a lien on any money, etc., which may become due the contractor by notifying in writing the public officials of the state of his claim. Chap. 78, Acts 1929, 41st Leg., p. 154, Vernon's Ann.Civ.St. art. 5472b—1, provides that when a claim or claims to fix the lien provided by Chap. 17 have been filed the contractor may release the lien by giving bond in double the amount of the claim, payable to the laborer and upon which he may sue. All of these statutes are in pari materis and authorize the instant suit. The parties so construed them by complying with their provisions as to notice of claim to fix the lien and giving of the bond to release

the lien, and this suit is upon the contract and bond obligation.

**▇▇** We are also of the view that appellee does have the right to maintain this suit as a third party beneficiary under the contract in suit. The provisions of the Act with respect to payment of minimum wages are required to be inserted in the public works contract and become a part of it. They were so inserted in the instant case. Such provisions of the contract are for the benefit and protection of the laborer, and the generally accepted rule is that a contract made by two parties for the benefit of a third party may be enforced by the suit of the latter. Such is the holding in Hearn v. Ralph Sollitt & Sons Const. Co., Tex.Civ.App., 93 S.W.2d 551, wherein the similar federal wage law was involved, and the court construed the contract as authorizing the laborer to sue thereon as a third party beneficiary.

**▇▇** But appellants contend that if it is held that appellee may maintain this suit as a third party beneficiary under the contract, then he is bound by its terms which make the decisions of the engineer of the Commission final and binding on the parties; and that in consequence his finding and conclusion on the complaint of appellee that he had been paid the proper scale of wages for his work is conclusive and binding upon him and precludes his right of recovery under the following provisions of the contract:

1. "The engineer will decide all questions which may arise as to the interpretations of the plans and specifications; and as to the acceptable fulfillment of the contract on the part of the contractor. His decisions will be final and he will have executive authority to enforce and make effective such decisions and orders as the contractor fails to carry out promptly."

2. "The work will be done under the supervision of the Engineer, to his satisfaction, and in accordance with the contract, plans and specifications. The engineer will decide all questions which may arise as to the quality or acceptability of materials furnished and work performed; the manner of performance and rate of progress of the work; the interpretation of the plans and specifications, and as to the acceptable fulfillment of the contract on the part of the contractor. His decisions will be final and he will have executive authority to enforce and make effective such decisions and orders as the contractor fails to carry out promptly."

3. "The engineer will decide all questions which may arise as to the acceptable fulfillment of the contract on the part of the contractor. His decisions will be final. The engineer will act as referee in all causes arising under the terms of the contract between the parties thereto and his decision shall be final and binding."

In this connection appellants also cite the provisions of Art. 5159a, § 4, which read as follows: "The term 'general prevailing rate of per diem wages' shall be the rate determined upon as such rate by the public body awarding the contract, or authorizing the work, whose decision in the matter shall be final."

The evidence shows that appellee made complaint to the resident engineer of the Commission who was in direct charge of the work that he was being paid the wages of an unskilled laborer and that he should be paid the wages of a skilled laborer for the work he was doing. The engineer investigated the matter and told appellee that he was being paid the proper wages under his interpretation of the contract. The matter was called to the attention of the district engineer, who ruled likewise, and after a hearing before the Commission's construction department, the State Highway Engineer made a like ruling. Appellee then filed his claim for the difference in the wages paid him as an unskilled laborer and the wages claimed as a skilled laborer, with the Commission, whereupon the Commission notified the contractor of the lien thus fixed upon money to become due on the contract, and suggested that the contractor might release the lien by filing the bond prescribed by Chap. 78, supra, which was done; and appellee brought this suit upon the contract and bond as provided by the statutes.

The quoted provisions of the contract require the engineer to act both in the capacity of an engineer and in the capacity of an arbiter or referee. In his capacity as engineer he is clearly authorized to finally pass upon the quality and acceptability of the work done under the contract, whether or not the plans and specifications were being properly followed; and whether or not the proper kinds and amounts of material were being used. He is likewise given final authority to determine whether the workmen and laborers were properly performing the work assigned to them.

These provisions of the contract relate primarily to questions arising between the state and the contractor and come clearly within the settled rule that where the parties to a contract have stipulated that the determination of the engineer as to such matters shall be final and conclusive, both parties are bound by his determination, except in case of fraud or of such gross mistake on his part as would necessarily imply bad faith or a failure to exercise an honest judgment. The provisions of quotations "1" and "2" are therefore not here involved. The provision here involved is quotation "3", which provides that "the engineer will act as referee in all causes arising under the terms of the contract between the parties thereto and his decision shall be final and binding." Appellants contend that "it is obvious that the question of whether or not a contractor has paid the wage scale required by the contract is a question arising under the terms of the contract." Appellee concedes that as a third party beneficiary under the contract he is bound by any of its terms and provisions which affect his work or rate of wages as provided for in the contract; but that he is not bound by an erroneous interpretation placed upon the contract by the engineer, and that the last quoted provision of the contract does not so bind him; and that if it does so bind him, it is void as being an attempt to oust the jurisdiction of the court to determine this legal question. We think that the question presented is controlled by the rule stated by the Supreme Court in Galveston, H. & S. A. R. Co. v. Henry & Dilley, 65 Tex. 685, 691, and 692, as follows:

"There is no doubt but that when parties to such a contract submit such a matter to the decision of the engineer, his determination is final and conclusive, unless, in making it, he has been guilty of fraud, misconduct, or such gross mistake as would imply bad faith or a failure to exercise an honest judgment. Martinsburg & P. R. Co. v. March, 114 U.S. 549 [5 S.Ct. 1035, 29 L.Ed. 255]. But his decision must be in accordance with the contract. The parties agree, as they did in this case, that he shall determine as to the amount of the work done by them under the contract, not that he shall make a different contract for them. He decides under the legal construction of the contract, not upon such construction as he may choose to give it. He is not made the arbitrator, to whom is to be referred differences as to the meaning of the contract, and he cannot adopt rules of measurement that it does not authorize."

In the instant case the engineer testified that under his "interpretation" of the contract the work of a "master finisher" of cement was not provided for nor required by the contract; but that if so, the work done by appellee was that of a master finisher of cement. Thus the engineer clearly placed his decision upon his interpretation of the contract as not providing for the work of a master finisher of cement. If the contract does provide for the work of a master finisher of cement, then his decision cannot stand because of the quoted rule that "his decision must be in accordance with the contract" and he may not give it any construction "he may choose to give it."

■ It is also manifest that the quoted provisions of Art. 5159a, providing for the ascertaining and fixing of the general prevailing rate of wages, and that the Commission's decision therein "shall be final," relate to the preliminary duty of the Commission before "undertaking any public work." Obviously, this finding or fixing of the minimum rate of wages must be final because the statute provides that the rate of wages so ascertained and fixed by the Commission "shall [be] specif[ied] in the call for bids for [the] contract, and in the contract itself." If the rate of wages so fixed was not made final the contractor would be unable to make estimates of the cost of the work, and his contract would be indefinite and hazardous. But the question of fixing the prevailing rate of wages is not involved because the Commission did ascertain and fix it as directed by the statute. The question here presented is whether appellee actually performed the work of a skilled laborer as defined in the contract, or merely performed the work of an unskilled laborer and for which he was paid.

■ Appellants next contend that the contract did not fix $1 per hour as the minimum rate of wages for the type of work done by appellee, nor that he did the work of a master finisher of cement as that term is defined in the contract. These contentions are not sustained, because the engineer testified that if the contract called for the labor of a master finisher of cement, then appellee performed that labor, and we interpret the contract as specifically providing for the labor of a master finisher

of cement and fixing the wages to be paid therefor at $1 per hour.

The order of the Commission ascertaining and fixing the rate of per diem wages was made a part of the contract as directed by the statute. It divided all labor into three general classes, skilled, intermediate, and unskilled, and defined each class in general terms as follows:

"Skilled labor: Skilled labor shall include the operators of complex heavy power equipment and skilled craftsmen of the journeyman grade whenever and wherever the nature of the work or labor agreements prevailing in the locality of the work require the use of craftsmen of this grade.

"Labor (intermediate grade):

"(a) The operators of all power equipment other than complex heavy power equipment, except passenger cars, trucks of 1½ ton or less manufacturer's rated capacity, and tractors of less than 20 horsepower manufacturer's rated capacity.

"(b) Men performing any other labor which requires considerable training and experience.

"Unskilled labor: Unskilled labor shall include helpers to journeymen craftsmen and all other labor which requires no special skill or experience."

Under the heading "Skilled Labor" was listed, among others, "Master Finishers (pavement and structure)." Under each of the headings, "Intermediate" and "Unskilled Labor," were listed several who worked with cement, but neither of them included the character of work which the undisputed evidence showed appellee to have performed.

It may be again observed that the contract defined "skilled labor" only in general terms and as being labor performed by "skilled craftsmen of the journeyman grade whenever and wherever the nature of the work or labor agreements prevailing in the locality of the work require the use of craftsmen of this grade." It then lists "Master Finishers (pavement and structure)" as skilled labor, but does not define the term "Master Finisher," nor define his duties, nor the character of his work. In consequence, "we could derive no light whatever from the contract itself" (Galveston, H. & S. A. R. Co. case, supra), and we must, as directed by the contract, determine whether the labor performed by appellee was that of a "skilled craftsman of

the journeyman grade whenever and wherever the nature of the work or labor agreements prevailing in the locality of the work require the use of craftsmen of this grade." This is the standard or test prescribed by the contract itself, and the engineers in charge of the work cannot destroy this provision of the contract by their interpretation of the contract as not providing for or requiring the labor of a master finisher of cement.

The work done by appellee was finishing of cement bridges and culverts after the forms or frames were removed. In the main it consisted of "chamfering, floating, honeycomb work, and rubbing or polishing after the frame is removed." He had nine years' experience in his work. The contract described minutely how chamfering, floating, honeycombing, rubbing and polishing were to be done. The first work done by appellee was to finish five bridges which had failed to pass the inspection of the engineer for the Commission, and he continued to do this same finishing work on other bridges for several months. On cross-examination appellee testified:

"Q. In addition to polishing, floating, cutting chamfers, and doing this honeycomb work, what else did you do? A. That completes the work you have to do to take care of the bridges."

Appellee and witness Hollis, a master finisher of cement, testified that "chamfering, floating, honeycomb work and rubbing or polishing after the frame is removed * * * is the work of a cement finisher"; that each of them belonged to a local labor union which classified them as master finishers; that the work of a master finisher is not different from the work done by appellee on the bridges in question; and that each of them had been employed for several months by the Colorado River Authority in Austin as master finishers doing the same work as appellee did on the bridges in question.

On this issue the engineer in charge of the work for Commission testified as follows:

"Q. What was the work of a master finisher on these culverts and bridges? A. We did not have any master finisher.

"Q. You did not have a master finisher on this work? A. Not under our interpretation of the term, and according to the work done, no sir, this had none.

"Q. Whatever work was done, he did it? A. Yes, sir, under the direct supervision of the foreman.

"Q. Under this section of the work Mr. Teague and Mr. McNabb were doing the work? A. Yes, sir.

"Q. Whatever finishing work was done on these bridges and culverts, they did it, whether it was called master finisher or not? A. Yes, sir.

"Q. If a man is using a float that is a straight edge, and is using this float doing straightening work and smoothing work, he is a master finisher is he not? A. Yes, but so is a trowel man. This aluminum straight edge is the final work. This is gone over finally and must be perfectly smooth, and the metal straight edge is used for that purpose.

"Q. A master finisher is one who uses this aluminum straight edge instead of the wooden straight edge? A. No, sir.

"Q. If, technically they are the same, what difference is there? A. According to the time taken in using this.

"Q. According to your testimony you do not have a master finisher out there. A. This type of work does not require a master finisher.

"Q. Why put a master finisher in the contract, if he is not used? A. Because it is used for all jobs and many contracts. They are mimeographed and a part of every contract.

"Q. If it required a master finisher they would have been required to furnish one? A. Yes, sir.

"Q. Although the contract called for a master finisher, your theory is that you did not require a master finisher and you did not use one? A. No, sir."

To the same effect was the testimony of the engineer in charge of the work for the Bridge Company.

Over objection appellants offered in evidence "Sheet 13" and "Sheet 14" of a Digest and Interpretation of Special Provisions for Projects financed by Regular Federal Aid Funds, which read as follows:

"The term 'master finisher' has been changed to include finishers of concrete riding surface on bridge floors, in addition to the master finisher on concrete pavement. This grade does not include rubbers or average trowel men, but should cover the employee or employees responsible for obtaining the smooth finish on the roadway surface."

"The rubbing of concrete culverts and bridges shall come under the classification of unskilled labor, even though it is entirely possible that some of these laborers may be paid a higher rate of pay and be considered as straw bosses in charge of gangs performing this work."

· These provisions were not incorporated in the contract and their purpose as stated in the Digest was as follows: "It should be borne in mind that this Digest is for informational purposes to aid the State's and contractors' representatives in interpreting the Special Provisions, and in no way supersedes the Special Provisions as approved by the Chief of Bureau."

The "Special Provisions" referred to are the above quoted three classifications of labor, and by express language the Digest instructions were "in no way to supersede the Special Provisions as approved by the Chief of Bureau," which defined a skilled laborer as being a "skilled craftsman of the journeyman grade whenever and wherever the nature of the work or labor agreements prevailing in the locality of the work require the use of craftsmen of this grade." This simply brings us back to the question of whether when viewed from this standard or test prescribed by the contract, the work of appellee was skilled labor, or was in "the nature of the work or labor agreements prevailing in the locality of the work require the use of craftsmen of this grade." The trial court held that the above evidence showed appellee to be a skilled laborer or master finisher as defined by the contract, and we sustain that conclusion, which we believe is sustained by the case of Galveston, H. & S. A. R. Co. v. Henry & Dilley, supra, holding that, "if we could derive no light whatever from the contract itself, we should have to read it in the light of the practice and usage of the company," or as in the instant case, in the light of the "nature of the work or labor agreements prevailing in the locality of the work require the use of craftsmen of this grade."

█ Appellants' remaining proposition is as follows: "Plaintiff has waived his rights to maintain this suit and is estopped to assert same and has released any claims he might have for additional compensation by virtue of having executed the daily time sheets wherein he agreed to the hourly

rate he was being paid, and by virtue of having accepted the various checks which were tendered to the plaintiff and accepted by him as payment in full for his services, and by virtue of having executed the release as payment in full for said services, and by virtue of having induced the defendant companies to continue his employment by leading them to believe he was satisfied with his wages."

Appellee, in answer to appellants' plea of waiver and estoppel alleged and proved that he signed the releases solely to obtain the check tendered to him by appellants; that he did not know the provisions of the contract providing for skilled labor; that no dispute existed as to the amount of wages due him under the contract at the time; and that he was not paid any consideration for the releases other than the amount tendered him for unskilled or intermediate labor. Under these facts the trial court concluded that there was no consideration for the releases and that there was no estoppel on the part of appellee to claim the $1 per hour due him under the contract. Such conclusion is sustained by the authorities. Oviett v. Warner, Tex.Com.App., 288 S.W. 434; Southwestern Gas & Electric Co. v. Cobb, Tex.Civ.App., 200 S.W. 1116; Lone Star Canal Co. v. Cannon, Tex.Civ.App., 141 S.W. 799; Guinn v. Culver, Tex.Civ.App., 81 S.W.2d 176; Chicago Fraternal Life Ins. Ass'n v. Herring, Tex.Civ.App., 104 S.W.2d 901.

The judgment of the trial court is affirmed.